UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GHAZI ABU NAHL and NEST INVESTMENTS
HOLDING LEBANON SAL, individually and on
behalf of LEBANESE CANADIAN BANK,

          Plaintiffs,

    v.

GEORGES ZARD ABOU JAOUDE, MOHAMED
HAMDOUN, AHMAD SAFA, OUSSAMA
SALHAB, CYBAMAR SWISS GMBH, LLC,
AYMAN SAIED JOUMAA, MAHMOUD
HASSAN AYASH, HASSAN AYASH
EXCHANGE COMPANY, and ELLISSA
HOLDING COMPANY,

          Defendants,

    and

LEBANESE CANADIAN BANK,

          Nominal Defendant.

---

15 Civ. _____

**VERIFIED COMPLAINT**

DEMAND FOR JURY TRIAL

**NATURE OF ACTION**

    1.    This Complaint arises out of an international money laundering scheme

designed, coordinated, and implemented by Georges Zard Abou Jaoude ("Abou Jaoude"),

Mohamed Hamdoun ("Hamdoun"), Ahmad Safa ("Safa") and the other Defendants to benefit the

operations of international narcoterrorists, including Hezbollah, as well as to line the pockets of

- 1 -

Defendants themselves. The details of the money laundering scheme were described in three separate enforcement actions by the U.S. Government: findings by the U.S. Treasury Department that the Lebanese Canadian Bank ("LCB" or "the Bank") was engaged in money laundering activities ("Treasury Finding"), a civil forfeiture complaint filed by the U.S. Attorney's Office for the Southern District of New York ("Civil Forfeiture Complaint"), and a criminal indictment obtained by the U.S. Attorney's Office for the Eastern District of Virginia ("Criminal Indictment") (collectively, "the U.S. government actions").

2.      Money flowing through LCB—controlled by Abou Jaoude, Hamdoun, and Safa—was at the center of the scheme described in the U.S. government actions: The money was first used to purchase used cars in the United States. The cars were then shipped to West Africa, where they were sold. Proceeds from narcotics sales in Europe and elsewhere were mixed with the money received from the sale of the cars, then the newly laundered drug money was reintroduced into the legitimate banking sector through LCB. Some of the laundered funds were sent back to the United States to purchase more cars and continue the cycle.

3.      In 2005, Abou Jaoude invited Abu Nahl and his companies to acquire a minority interest in LCB. At the time that Abou Jaoude induced Abu Nahl and the Nest Group to invest in the Bank, he affirmatively misled them about the state of LCB's compliance programs, among other things. After acquiring a minority stake in LCB, however, Abu Nahl and the Nest Group realized that internal controls and compliance measures at the Bank were woefully inadequate and, in some cases, entirely non-existent.

4.      Having made their investment, the Nest Group decided to try to use their considerable expertise in good corporate governance and compliance to strengthen such programs at the Bank. But their efforts to improve compliance at LCB were frustrated by continuing

opposition led by Abou Jaoude and Hamdoun, who together own or control entities that own approximately 76% of the Bank. At the time, the Nest Group members believed that Abou Jaoude and Hamdoun's refusal to implement better compliance measures stemmed from incompetence or a nonchalant attitude toward good corporate governance, not rampant criminality.

5.       That all changed beginning in 2011, when the U.S. Government publicly exposed Defendants' international narcoterrorism and money laundering scheme. Only then did Abu Nahl and the Nest Group begin to understand the real reason that Abou Jaoude and Hamdoun had frustrated their attempts to increase transparency and internal controls at the Bank: because their efforts posed a grave threat to Abou Jaoude and Hamdoun's money laundering scheme and, as part and parcel of that scheme, their efforts to siphon off money from the Bank into their own personal slush fund.

6.       This money laundering scheme, which has been organized and carried out by the means set forth in this Complaint, has resulted in substantial reputational and financial harm to Plaintiffs. It also has resulted in substantial losses to, and the cessation of independent banking and business operations by, LCB.

**PARTIES**

A.       <u>Plaintiffs</u>

7.       Plaintiff Ghazi Abu Nahl ("Abu Nahl") is a Jordanian businessman and Group Chairman of Nest Investments (Holdings) Ltd. ("Nest Investments"). Born in Barbara, Palestine and with only a basic high school education, Abu Nahl built his businesses from the ground up. He became one of the first entrepreneurs to sell insurance policies in the region. Nest Investments owns and operates a number of businesses, primarily in the insurance and reinsurance

industries, in the Middle East and North Africa ("MENA") region. Abu Nahl directly owns a 1.36% stake in LCB.

8.  Plaintiff Nest Investments Holding Lebanon SAL is a corporate entity incorporated under the laws of Lebanon with its principal place of business in Beirut, Lebanon. Nest Investments Holding Lebanon SAL owns a 12.5% stake in LCB. Nest Investments Holding Lebanon SAL, in turn, is principally (99%) owned by Abu Nahl. Nest Investments and Abu Nahl, together with other affiliates and associates (collectively, the "Nest Group"), own a combined 24% stake in LCB.

**B.  Defendants**

9.  Nominal Defendant the Lebanese Canadian Bank is a corporate entity based in Beirut, Lebanon. LCB previously operated as a bank, offering personal and corporate banking services with branches throughout Lebanon. At its peak, LCB was the eighth largest bank in Lebanon, with assets worth more than $5 billion. LCB is currently in liquidation. In 2011, when it was forced into liquidation because of the managers' unlawful money laundering activities, LCB was worth around $2 billion. As a result of the liquidation triggered by the money laundering scheme, the net proceeds from the sale of the Bank's assets will be less than $400 million.

10.  Defendant Georges Zard Abou Jaoude is the former Chairman and General Manager of LCB. He formerly served as the Chair of LCB's Anti-Money Laundering Committee. Abou Jaoude directed the affairs of the international money laundering scheme that ultimately resulted in multiple U.S. government investigations and the collapse of LCB. Through his interlocking board and management positions in LCB, Abou Jaoude directed both the money laundering operation and efforts to conceal the scheme from the Nest Group and from U.S. and other law enforcement officers and regulators. In spite of his participation in the money laundering

- 4 -

scheme, Abou Jaoude remains active in the Lebanese banking sector and apparently in good standing with the Central Bank of Lebanon. With the tacit approval of the Central Bank of Lebanon, he is currently acting as one of LCB's liquidators, putting him in a position to conceal the full extent of his participation in the illicit money laundering scheme and further damage Plaintiffs. Upon information and belief, Abou Jaoude, together with Hamdoun, is preparing to open a new bank in Lebanon, with the approval of the Central Bank of Lebanon.

11.     Defendant Mohamed Hamdoun is the former Deputy General Manager of LCB and served on LCB's Executive Board. He served as the Vice Chair of LCB's Anti-Money Laundering Committee. Together with Abou Jaoude, Hamdoun directed the money laundering scheme detailed in this Complaint. Through his interlocking board and management positions in LCB, Hamdoun directed both the money laundering operation and efforts to conceal the scheme from Plaintiffs and from U.S. and other law enforcement and regulators. In spite of his participation in the money laundering scheme, Hamdoun remains active in the Lebanese banking sector and apparently in good standing with the Central Bank of Lebanon. With the tacit approval of the Central Bank of Lebanon, he is currently acting as one of LCB's liquidators, putting him in a position to conceal the full extent of his participation in the illicit money laundering activities and further damage the Plaintiffs. Upon information and belief, Hamdoun, together with Abou Jaoude, is preparing to open a new bank in Lebanon, with the approval of the Central Bank of Lebanon.

12.     Defendant Ahmad Safa is the former Assistant General Manager responsible for overseeing all LCB branches. He reported directly to Abou Jaoude and functioned as Hamdoun's operational enforcer at the Bank. Through his managerial and operational roles at LCB, Safa organized and directed the day-to-day money laundering activities run through LCB. In or around 2010, Safa left the Bank and assumed a position as a Member on the Banking Control

Commission, an arm of the Central Bank of Lebanon responsible for supervising and auditing banks, brokerage houses, and other financial institutions. In March 2015, Safa was reappointed to the Banking Control Commission.

13. Defendant Oussama Salhab ("Salhab"), according to the U.S. government, is a Hezbollah operative who controls a network of money couriers based primarily in West Africa. According to the U.S. Treasury Department and a civil forfeiture complaint filed by the U.S. Attorney for the Southern District of New York, Salhab helped coordinate the network that ran proceeds from, and money intended to benefit narcoterrorists through, LCB into the United States and back to Africa and the Middle East using companies under his control. Salhab worked with Defendants Abou Jaoude, Hamdoun, and Safa to coordinate the flow of currency from the drug trafficking and terrorist financing operations through the Bank. Salhab also organized individual couriers who transported the proceeds of narcoterrorism into the United States.

14. Defendant Cybamar Swiss Gmbh, LLC ("Cybamar Swiss") is a corporation headquartered in Redford, Michigan, with affiliated companies located in Europe. Cybamar Swiss's registered address is 12130 Dixie Street, Redford, Michigan 48239. Cybamar Swiss is owned, operated, or controlled by Defendant Salhab or his relatives and associates. According to the U.S. Treasury Department and a civil forfeiture complaint filed by the U.S. Attorney for the Southern District of New York, Cybamar Swiss is a shipping company used by the U.S.-based network of money launderers to ship used cars purchased with the proceeds of international drug trafficking to West Africa for sale. Defendant Salhab and his money couriers traveled to the United States to advance the money laundering scheme, ostensibly to conduct business on behalf of Cybamar Swiss.

15. Defendant Ayman Saied Joumaa ("Joumaa") has been designated by the U.S. Department of Treasury as a Drug Kingpin under the Foreign Narcotics Kingpin Designation Act, 21 U.S.C. §§ 1901 – 08. According to the Treasury Department, Joumaa controls and directs an international network of traffickers and launderers that transports, distributes, and sells multi-ton shipments of South American cocaine to West Africa. In 2011, Joumaa was charged in the Eastern District of Virginia with conspiracy to distribute narcotics and conspiracy to launder money for his role in coordinating the shipment of tens of thousands of kilograms of cocaine, including to Mexican drug cartels, and laundering hundreds of millions of dollars in proceeds generated from narcotics sales in the United States, Europe, West Africa, and Mexico.

16. Defendant Mahmoud Hassan Ayash ("Hassan Ayash"), according to the U.S. Government, is a Hezbollah operative who facilitates bulk cash transfers and money laundering for Defendant Joumaa and other narcoterrorists. He has family ties to Secretary General Hassan Nasrallah, the leader of Hezbollah. The U.S. government has asserted that Hassan Ayash (1) helped connect and facilitate the money laundering scheme between Joumaa and Bank managers, including Defendants Abou Jaoude, Hamdoun, and Safa, and (2) helped coordinate wire transfers through the Bank to the United States for the purpose of laundering drug proceeds by purchasing used cars in the United States and shipping them to West Africa.

17. Defendant Hassan Ayash Exchange Company ("Hassan Ayash Exchange") is a money exchange company in Beirut, Lebanon. It is owned and controlled by Defendant Hassan Ayash and his son Hassan Mahmoud Ayash. The U.S. government has found that the Hassan Ayash Exchange facilitates bulk cash transfers and launders money for Defendant Joumaa's narcoterrorism network. According to the U.S. Government, Defendants Abou Jaoude, Hamdoun, Safa, Joumaa, and Hassan Ayash use the Hassan Ayash Exchange to originate wire

transfers to the United States to fund the purchase of used cars; the wire transfers and car purchases were part of the money laundering scheme run through the Bank and intended to disguise and conceal the source, nature, ownership, and control of proceeds of narcotics trafficking for the benefit of Hezbollah.

18.     Defendant Ellissa Holding Company owns and controls multiple companies based in Lebanon, Benin, and the Democratic Republic of the Congo, including the Ellissa Exchange Company ("Ellissa Exchange"), a money exchange in Sarafand, Lebanon. The U.S. government has asserted that the Ellissa Exchange facilitates bulk cash transfers and launders money for Defendant Joumaa's narcoterrorism network. Defendants Abou Jaoude, Hamdoun, Safa, Joumaa, and Hassan Ayash were reported to have used the Ellissa Exchange to originate wire transfers to the United States to fund the purchase of used cars. The wire transfers and car purchases reportedly were part of the money laundering scheme run through the Bank and were intended to disguise and conceal the source, nature, ownership, and control of proceeds of narcotics trafficking for the benefit of Hezbollah. The Ellissa Holding Company also owns and controls Ellissa Group SA, which owns a car park in Benin used for receiving used cars shipped from the United States and Ellissa Shipping, which is alleged to have transported some of the cars involved in the money laundering scheme. The Ellissa Holding Company is reported to be controlled by Jamal Mohamad Kharoubi and Ali Mohammed Kharroubi, a self-proclaimed supporter of Hezbollah.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 18 U.S.C. § 1964(c) (Racketeer Influenced and Corrupt Organization Act).

20.     In addition, Plaintiffs invoke the supplemental jurisdiction of this Court, 28 U.S.C. § 1367, over common law claims.

21.     Venue is proper in this district over all defendants under the venue and process provisions of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1965.

**FACTUAL ALLEGATIONS**

A.     **History of the Nest Group and Abu Nahl**

22.     Nest Investments (Holdings) Ltd. is a group company established in 1989 by Abu Nahl, a Jordanian businessman with over 45 years' experience in the highly regulated insurance sector. Under Abu Nahl's leadership, Nest Investments (Holdings) Ltd. and its affiliated companies ("Nest Companies") expanded their operations to 23 countries in North America, Europe, Africa, the Middle East, Asia, and Australia.

23.     Abu Nahl was born in Palestine in 1946. In 1962, Abu Nahl's father borrowed money to send Abu Nahl to high school in Egypt. Worried about the toll this sacrifice would take on his father and the rest of his family, Abu Nahl returned to Palestine after 40 days and returned the money intended for his schooling to his father. Abu Nahl then moved to Qatar in 1964 to find work. Soon, he heard about a concept that, at the time, was foreign in the Persian Gulf region: insurance. He began selling insurance policies. After his initial success in the insurance industry, Abu Nahl arranged a meeting with the Emir of Qatar to discuss the importance of insurance. Soon, Qatar required all automobile owners to carry insurance on their cars. Abu Nahl was the founder of one of the first Persian Gulf insurance companies, now the Nest Companies.

24.     The Nest Companies own and operate a number of insurance and reinsurance companies. The Nest Companies also own investments in real estate and other industries. They employ around 1,200 people worldwide.

25.     The Nest Companies have a solid and hard-earned reputation in the insurance industry. One of the leading insurance rating agencies, A.M. Best, has assigned Trust International Insurance and Reinsurance Company B.S.C. ("Trust Re"), the Nest Group's primary insurance and reinsurance company, an A- Rating – which A.M. Best classifies as "Excellent." When A.M. Best most recently reaffirmed Trust Re's Excellent rating in August 2014, it wrote: "[t]he ratings reflect Trust Re's good risk-adjusted capitalisation, track record of strong operating performance and developing business profile." In particular, A.M. Best highlighted Trust Re's "disciplined risk selection" and "prudent reserving policy." Another leading rating agency, Standard & Poor's, also gave Trust Re an A- rating in 2014, writing "[t]he rating reflect our view of the group's satisfactory business and strong financial risk profiles, built on an adequate competitive position, very strong capital and earning, and a moderate risk position."

26.     Abu Nahl also currently serves as chair of the World Trade Center Association, a non-profit organization that partners with commercial property developers, economic development agencies, and international businesses to promote trade and investment in more than 90 countries around the world. Abu Nahl's involvement with the World Trade Center Association began around 1995. When he was elected Chair of the organization in 2008, he quickly applied his corporate governance expertise to establish systems and proper controls throughout the organization to improve its functioning and services. The Association is now more transparent and applies worldwide standards on corporate governance, including risk management, internal auditing, transparency, high-level financial reporting, and independent board elections.

B.    **Nest Group's Initial Involvement with LCB**

27.    In 2000, the Nest Group expanded its insurance operations into Algeria, establishing Trust Algeria Insurance and Reinsurance. Impressed with the Nest Group's successful establishment of insurance operations, the Algerian authorities asked the Company to establish a bank in the country. In 2002, Algeria granted the Nest Group a banking license and the Company founded Trust Bank Algeria ("TBA") in Algiers.

28.    The Algerian banking sector is highly regulated, with the Algerian Central Bank tightly controlling which banks may operate and who may own or control shares in banks in the country. The banking sector is heavily dominated by state-owned banking operations. Because private banks are rare in Algeria, the Nest Group's Algerian banking license and its control and operation of TBA are both unusual and highly coveted by other companies seeking access to the Algerian banking sector. When TBA was established by the Nest Group in 2002, other banking operations were actively seeking investment opportunities in entities with Algerian banking licenses because of the promise of substantial profits. Expansion into the Algerian banking sector was difficult, however, because of the scarcity of private enterprises with banking licenses.

29.    In 2005, three years after TBA's founding, the Algerian Central Bank required all banks in the country to increase their capital. In part because the Nest Group wanted to diversify its investment risk, it began looking for other investors in TBA. Abu Nahl and the Nest Group were particularly interested in partnering with an investor who could offer additional banking experience and expertise.

30.    During this search for a strategic banking partner, Abu Nahl and the Nest Group had discussions with several different banking organizations, including LCB. In 2005,

Case 1:20-mc-00046-ABJ Document 42-1 Filed 06/16/21 Page 12 of 49

Defendant Abou Jaoude approached Abu Nahl to discuss his interest in organizing an investment in TBA by LCB.

31. At the time, Abou Jaoude was under considerable personal financial strain. He had accumulated at least $15 million in private debt with multiple banks in Lebanon and elsewhere. As a result, he lacked the necessary capital to simply purchase a stake in TBA. To help fund the acquisition of TBA, Abou Jaoude proposed a separate transaction under which he would sell the Nest Group a minority stake in LCB.

32. At the time, Abou Jaoude's proposal seemed attractive to Abu Nahl and the Nest Group. Among other things, the Nest Group consulted banking almanacs, which listed LCB as one of the top ten banks in Lebanon. In addition, the Nest Group at the time believed that the banking expertise of Abou Jaoude and LCB would be beneficial to the operations of TBA.

33. Ultimately, the Nest Group (including Plaintiffs) acquired a 24 percent stake in LCB through a series of transactions between late 2005 and late 2007. In exchange for its minority, non-controlling share of the Bank, the Nest Group, including Plaintiffs, paid LCB a total of more than $57 million. The last of these transactions was completed in 2007.

34. The separate transaction, however, under which LCB, at Abou Jaoude's control and direction, would acquire a majority stake in TBA, ultimately fell through. That transaction was conditioned on receiving the necessary approvals from Algerian banking regulators, which the Algerian regulators did not provide. After it became clear that the Algerian authorities were not going to approve the transaction, LCB's investment in TBA was refunded pursuant to a conclusive agreement among the parties.

C.     **The Nest Group's Efforts to Introduce Principles of Corporate Responsibility and Compliance into LCB**

35.     Prior to the Nest Group's acquisition of a minority interest in LCB, Abou Jaoude and Hamdoun actively misled the Nest Group about the state of compliance efforts at the Bank. Based on Abou Jaoude and Hamdoun's representations, the Nest Group believed LCB had robust compliance programs in place that met international standards and industry best practices.

36.     On June 28, 2007, Abu Nahl joined the LCB board of directors as representative of Nest Investments Holding Lebanon SAL. Including Abu Nahl, Nest Group representatives held 3 of the 10 LCB board seats. (The remaining board seats were under the control of Abou Jaoude and Hamdoun.) After joining the board, Abu Nahl quickly realized that LCB's compliance programs were not as strong as the Nest Group had been led to believe and were, in some cases, nonexistent. Having already made its investment in LCB, the Nest Group set about trying to strengthen the Bank's compliance. The Nest Group believed that its decades of experience developing and implementing good corporate governance and compliance programs in its many businesses would strengthen LCB's operations and position the Bank for strong, responsible growth.

37.     Almost immediately after the transaction closed, however, the Nest Group encountered difficulties extracting information from and strengthening compliance efforts in LCB. Initially, the Nest Group attributed these difficulties to incompetence or a nonchalant attitude by Abou Jaoude and Hamdoun toward compliance and good corporate governance. Only later—after learning about the narcoterrorism and money laundering operation Abou Jaoude and Hamdoun had run through LCB—did they realize that Abou Jaoude and Hamdoun were actively frustrating their efforts to improve Bank governance because such efforts represented a direct threat to the money laundering scheme described in the U.S. government actions.

38.     On June 18, 2007, for example, the Bank's Chief Financial Officer, Charles Skaff, issued a cursory memorandum on the financial status of the Bank. Given both its lack of substance and lack of sufficient information, the memorandum raised immediate red flags for the Nest Group.

39.     One day after receiving the financial memorandum, on June 19, 2007, the Nest Group sent Abou Jaoude a lengthy letter with a list of questions regarding the substance of the report and the financial status of the Bank. In particular, the Nest Group asked for clarification on LCB's decision-making process and policies. Abou Jaoude did not respond to the letter.

40.     On June 22, 2007, Abu Nahl followed up with a second letter to Abou Jaoude, copying Hamdoun, requesting additional information on LCB's budget. Among other things, Abu Nahl noted that LCB's budget lacked proper documentation, that many items were not included in the budget, and that funds were improperly reallocated without following the appropriate decision-making process or maintaining adequate documentation. Abou Jaoude did not respond to Abu Nahl's follow-up letter.

41.     On June 25, 2007, LCB's Internal Audit Division audited the compliance unit. The audit noted that a number of accounts at the Bank were unusually active, with large incoming and outgoing transfers. The audit also noted that many of these accounts had unusual movement of funds between accounts.

42.     On August 13, 2007, the Internal Audit Division sent a report directly to Abou Jaoude raising direct and specific concerns about troubling account activity. The report stated, in part:

> "Upon our review and general monitoring over some accounts, we [have] come across a group of customers showing continuous and considerable movements of funds, which according to our examination should be reviewed and be subject to further investigations by the compliance unit . . . . [W]e therefore address to your

attention as head of the [Anti-Money Laundering] committee our memo in which we reveal some deficiencies and banking concept breaching, together with a list of customers' names to which these transactions are related for your quick review.

Types of deficiencies can be summarized by the following:

1. Many of these deficiencies have been traced over saving time deposit accounts in which they are being used as current accounts.
2. The total amount of transactions between reviewed accounts has reached within 18 months a total of USD 5,000 Million.
3. Large amounts are being withdrawn and paid cash to different parties.
4. A clear link was noticed between 115 IDs existing and operating in different branches.
5. Although the big volume of movement noticed over these accounts, yet the accounts show [] very low balances (below USD 5,000) reflecting the fact that accounts are being used [on a] transitory basis for funds transfer[s].
6. Accounts are originally opened for Domiciled bills were used for funds transfers with large amounts.
7. Commissions and bank profitability are limited comparing the volume and number of transactions executed.
8. We noticed, some accounts were opened to be used as transitory account[s] for a short period of time. (Vehicle Accounts)
9. Large amounts of cash withdrawal transactions were made to the favor of different parties, to be paid later on cash to the same beneficiary. Noticing that such transactions are being done from different accounts to the order of one specific party which rises up different question marks."

43. In the August 2007 audit report sent to Abou Jaoude, the internal auditors noted they had previously raised these concerns with and given a list of suspect accounts to the compliance department, but the compliance department had failed to take action. The internal auditors also recommended that Abou Jaoude take certain specific corrective actions, including implementing better monitoring software and installing compliance officers at all branches to monitor suspicious activity. Abou Jaoude sent a cursory reply on August 17, 2007 asking for more detail, but he never implemented the recommendations.

44. Increasingly concerned about the financial performance and compliance of LCB, the Nest Group requested that LCB create an Audit Committee. As evidenced by the subsequent inaction of Abou Jaoude and Hamdoun, they had no intention of executing

- 15 -

recommendations or responding to the concerns raised by the Audit Committee and the Nest Group. Indeed, the Audit Committee appeared to be created only as a means to mollify and distract the Nest Group. It was not even included on a list of Bank management committees prepared in 2009.

45.     In further effort to improve governance of the Bank, Nest Group member Sh. Nasser Bin Ali Bin Saud Al Thani ("Sh. Nasser") was appointed to the Audit Committee. Not knowing that Abou Jaoude and Hamdoun had no intention of following the recommendations of the Audit Committee, Sh. Nasser and other Nest Group representatives diligently set about trying to understand and improve internal controls and compliance measures at LCB. The Nest Group asked one of its best compliance experts, Loizos-Andreas Hajiloizos ("Hajiloizos"), to work with the LCB Audit Committee to evaluate and suggest improvements for Bank compliance operations. Hajiloizos was named the Committee's General Secretary, responsible for preparing Committee documents and reports and recording the minutes of Committee meetings.

46.     On June 9, 2008, the LCB Audit Committee held its first meeting in Beirut. The four members of the Audit Committee—Sh. Nasser, Makarem Makari, Raymond Diab, and Albert Azar—attended. Hajiloizos was also present.

47.     At its first meeting, the Audit Committee agreed that LCB should host a meeting of all senior Bank staff to discuss the role of the Audit Committee and Internal Audits, and the importance of compliance. As recorded in the minutes of the meeting, the Audit Committee hoped that "the top management of the Bank," including Abou Jaoude and Hamdoun, would "present the General Inspector and his team to show the support of the [Board of Directors] to the [Internal Audit Department]." But Abou Jaoude and Hamdoun had no intention of supporting the Internal Audit Department.

- 16 -

48.     Abou Jaoude and Hamdoun refused to arrange a meeting with top LCB management to discuss the role and importance of the Internal Audit Department. At a meeting nearly six months after the first Audit Committee meeting, on December 5, 2008, the Audit Committee discussed Abou Jaoude and Hamdoun's refusal to permit such a meeting. The Audit Committee minutes reflect this discussion: "The [Audit Committee] members cannot understand the reason behind the unwillingness of the top management of the bank [] to hold a meeting with all the managers of the Bank to discuss the Internal Audit Department Charter and any other Internal Audit issues that they may have. Sh. Nasser & [Hajiloizos] to discuss the above with the management of the Bank."

49.     At an LCB Board of Directors meeting on July 2, 2009, Sh. Nasser and Hajiloizos again asked Abou Jaoude and Hamdoun to arrange a meeting of all Bank managers to discuss the role of the Internal Audit Department. According to Audit Committee minutes, "the idea was not accepted in a positive manner; thus the meeting was never organised or held."

50.     At its July 2, 2009 meeting, the Audit Committee learned that LCB's Anti-Money Laundering Compliance Officer had resigned some eight months earlier—in October 2008—and had not been replaced. The Audit Committee found this lapse "to be unacceptable and in violation of corporate governance and best practices." In December 2009, the Compliance Manager had still not been replaced, prompting the Audit Committee to send a memorandum to the Human Resources Manager asking that a replacement be named immediately.

51.     The Nest Group representatives on the Audit Committee worked to implement other measures to improve compliance and ensure LCB adhered to industry best practices. For example, the Audit Committee recommended LCB's external auditors be rotated on a regular basis. The Bank had been using the same auditing firm for at least 15 years. But Abou

Jaoude and Hamdoun did not agree to rotate the audit firm. The Audit Committee also recommended that the Internal Audit Department report directly to the Audit Committee, and not to Abou Jaoude, the General Manager. At Abou Jaoude and Hamdoun's direction, LCB did not implement this change to the reporting lines.

52.     As the years passed, the Nest Group, the Audit Committee, and the Internal Audit Department continued to sound alarms about inadequate internal controls. But their concerns continued to fall on deaf ears. In February 2010, the Internal Audit Division conducted another review of the Anti-Money Laundering compliance unit and found compliance efforts had not improved. In particular, the internal audit found "no evidence that proper and permanent control [was] being performed over some accounts witnessing frequent flow of large funds transfers." The internal audit also noted that the "compliance unit [had] 5,775 pending alerts cases during a period of one month (December, 2009)" and that branch managers, upon information and belief at Abou Jaoude and Hamdoun's direction, were not prioritizing resolving the backlog of alerts.

53.     The February 2010 internal audit also found LCB managers continued to ignore compliance and reporting requirements for large cash transactions. The report noted that "the Compliance Unit does not generate on a daily basis [a] consolidated physical cash report that aggregates all cash deposits done by a single client, [on] the same day, and in multiple accounts totaling more than $10,000." Abou Jaoude, Hamdoun, and Safa directed the Compliance Unit not to generate such daily cash reports.

54.     Finally, the February 2010 internal audit noted that LCB managers were ignoring Know Your Customer monitoring and reporting requirements. Industry and international best practices, as well as laws and regulations in most countries, including Lebanon, require

financial institutions to establish certain procedures to verify the identity of customers in order to

combat money laundering and other financial crimes. These procedures are known as "Know Your

Customer" requirements. The February 2010 audit found bank managers were turning a blind eye

to cash and transfer activities that were inconsistent with certain clients' Know Your Customer

forms. Abou Jaoude, Hamdoun, and Safa instructed branches to ignore the Know Your Customer

form requirements for certain customers.

55.     Abou Jaoude and Hamdoun both served on LCB's five-member

Anti-Money Laundering ("AML") Committee. The committee existed essentially in name only. In

2007, when the Nest Group representatives on the Audit Committee were trying to determine the

extent of LCB's compliance shortcomings, they raised concerns about various suspicious

accounts. In 2009, in a memorandum to the Human Resources Manager, the Nest Group noted that

the AML Committee was dormant and recommended its activation.

56.     Throughout this period, at every turn, Abou Jaoude and Hamdoun took

steps designed to frustrate the efforts of the Audit Committee and the Nest Group to implement

better corporate governance measures. For example, Abou Jaoude and Hamdoun consolidated

control over hiring, firing, and promotion decisions, allowing them to place persons under their

control in positions critical to operating and concealing the money laundering scheme. A 2010

Audit report on the Human Resources department highlighted this consolidation of control:

"Theoretically, the Human Resources Department is fulfilling its responsibilities, as we noticed

that job descriptions are documented, evaluation process is implemented, appraisal report is being

filed on yearly basis and procedures are being handled; but practically, the department is

superseded since a long time by the Senior Management Power and Directives."

- 19 -

D.   **Tabadul, the Nest Group's Increasing Concern over Governance and Compliance, and Abou Jaoude and Hamdoun's Personal Slush Funds**

57.   Over time, it became increasingly difficult for the Nest Group to extract information about LCB from Abou Jaoude and Hamdoun. Moreover, due to staunch resistance from Abou Jaoude and Hamdoun, the Nest Group's efforts to strengthen compliance and corporate governance at the Bank had largely failed to achieve positive results.

58.   The Nest Group later uncovered one reason why Abou Jaoude and Hamdoun had stonewalled the Nest Group's compliance efforts: the Bank managers had been directing illegal operations through a subsidiary of LCB in the United Arab Emirates called Tabadul Shares and Bonds LLC ("Tabadul").  As described below, Abou Jaoude and Hamdoun actively concealed Tabadul's operations from the Nest Group and used the subsidiary to engage in improper self-dealing.

59.   On October 18, 2006, shortly after the Nest Group's initial investment into LCB, Abou Jaoude founded Tabadul. Tabadul is a brokerage firm in the United Arab Emirates with offices in Dubai and Abu Dhabi. It began operations in 2007. Tabadul was owned and funded by LCB but controlled by Abou Jaoude. Over time, LCB continued to invest in Tabadul. LCB increased the capital of Tabadul several times, including in November 2006, January 2007, and January 2008.

60.   As with LCB, Abu Nahl sought to obtain detailed budgets regarding Tabadul. At a board meeting on July 14, 2010, Abu Nahl voiced his concerns over the lack of a detailed budget for Tabadul. Only later would the Nest Group learn their efforts had been unsuccessful because Abou Jaoude and Hamdoun were actively working to frustrate them.

61.   Abou Jaoude and Hamdoun intentionally hid information about Tabadul's operations from the Nest Group and from public disclosure. On June 6, 2010, Sh. Nasser sent

Abou Jaoude a letter requesting, on behalf of the Audit Committee, more detailed information on the LCB investment in Tabadul. Abou Jaoude sent a cursory reply stating the Internal Audit Department had all the information on Tabadul that it needed. But, the Internal Audit Department had not been supplied with <u>any</u> information on the Tabadul investment since it performed an audit in January 2008. The UAE regulatory authority expressed these and other concerns, including deceit, failure to meet licensing conditions, and commingling of funds. Its concerns were so pronounced that it imposed a cessation of business on Tabadul, which was extended multiple times because of Tabadul's failure to cure its violations.

62.     In 2009, at least five Tabadul employees resigned, including its Internal Auditor, who lamented Tabadul's lack of commitment to abide by licensing conditions. Others remarked that "difficulties and problems faced by the administration were not new, but were present from the day the company began trading from the Lebanese Canadian Bank side, which acted somewhat irresponsibly."

63.     In addition to concealing information about Tabadul's operations and unlawful activities, Abou Jaoude and Hamdoun also concealed information regarding several suspicious LCB subsidiaries in West Africa. In November 2009, the LCB Chief Risk Officer, who had only been appointed at the insistence of the Nest Group, raised concerns to the LCB Risk Committee about an LCB presence in Gambia called Prime Bank Gambia. According to the minutes of that meeting, the Chief Risk Officer stated that:

> LCB has a presence in Gambia with thirty employees and until today there are no reporting lines, only the finance manager knows about it and nobody else receives any information on their business. No fixed asset has been purchased as part of the investment. Very soon they will need re-capitalisation since the currency fluctuations are eating up their initial capital.

The Chief Risk Officer further noted that "[t]he situation [with Prime Bank Gambia] is about to be repeated with the Kinshasa-Congo investment."

64.     The head of LCB's Internal Audit Department further noted in June 2010 that the department continued to have no visibility into Prime Bank Gambia or other West African operations, including in Congo. The secrecy surrounding these operations persisted at Abou Jaoude and Hamdoun's direction, even though LCB's Chief Risk Officer had raised red flags about the operations nearly nine months prior.

65.     Undeterred, the Nest Group continued to press Abou Jaoude and Hamdoun for information about the operations of LCB and its subsidiaries, including Tabadul. It also continued to try to implement compliance measures and internal controls.

66.     The Nest Group eventually realized that Abou Jaoude and Hamdoun were using these subsidiaries to funnel assets from LCB to line their own pockets. For example, Abou Jaoude and Hamdoun used sham loans to funnel assets from LCB to Tabadul. On or about May 1, 2008, LCB and Tabadul entered into a Revolving Subordinated Loan Agreement under which LCB agreed to extend a $20 million line of revolving credit to Tabadul. Abou Jaoude signed the loan agreement on behalf of <u>both</u> LCB <u>and</u> Tabadul. Hamdoun also signed on behalf of LCB.

67.     Abou Jaoude and Hamdoun also used Tabadul to make sham loans. Tabadul made numerous suspicious loans to various individuals in the United Arab Emirates. When the Nest Group began investigating these loans, many of the individuals who supposedly received loans said they had never even heard of Tabadul. They certainly had not opened accounts with or received loans from Tabadul. Upon information and belief, Abou Jaoude and Hamdoun directed or made these loans in the names of unsuspecting third parties and took the money for their own benefit.

68.     Abou Jaoude and Hamdoun's wrongdoing was not limited to siphoning off assets through Tabadul. Expenses increased noticeably, and Abou Jaoude admitted this was partially because of bonuses that he paid to himself and his associates. Additionally, in 2008, Abou Jaoude had an outstanding $12 million loan from LCB. All banks in Lebanon are required to file what is known as a 152 Report with the Central Bank of Lebanon disclosing loans made to staff, directors, and shareholders. At its meeting on December 5, 2008, the Audit Committee noted:

> "The loans to staff, directors and shareholders were not approved since it contained errors and was [not] transparent . . . The [Internal Audit Department] was requested to prepare a new transparent report with all the details and to compare this to the 152 report sen[t] to Central Bank of Lebanon since . . . the chairman of the bank [Abou Jaoude] has a $12 million loan with a $2 million collateral and it was not included in the 152 report to the central bank."

Despite the fact that the Central Bank of Lebanon routinely had auditors on site at LCB who were ostensibly monitoring reporting and compliance, the Central Bank of Lebanon either failed to discovery this egregious reporting failure or turned a blind eye to it.

69.     At Abou Jaoude and Hamdoun's direction, LCB also failed to follow proper procedures for credit approvals of investments. At the November 2009 Risk Committee meeting, the Chief Risk Officer explained:

> "[T]here is no procedure followed for the credit approvals of investments taken by the Bank and this is considered as high risk. The Chairman [Abou Jaoude] ($900k) and the GM [Hamdoun] ($750k) of the Bank seem to have money limits but they have never been followed. There do not seem to be a proper investment policy in the following fields:
> a.   Affiliates
> b.   Subsidiaries
> c.   Bonds
> d.   Stocks
> e.   CD
> f.   Funds"

In response to these concerns, the Risk Committee (at the insistence of Sh. Nasser and Hajiloizos) requested the Bank's Chief Risk Officer prepare draft investment policies and procedures for the

Bank to ensure accountability and compliance. Abou Jaoude and Hamdoun ultimately thwarted the implementation of investment policies and procedures.

**E.**     **U.S. Government Action on Money Laundering Scheme**

70.     On February 10, 2011, the U.S. Department of Treasury's Financial Crimes Enforcement Network ("FinCEN") issued a notice of finding and proposed rulemaking ("Treasury Finding"), which identified LCB as a financial institution of primary money laundering concern. *See* Exhibit A. Under authority granted by the USA PATRIOT Act, the Secretary of the Treasury can designate banks and other financial institutions as presenting primary money laundering concern if the Secretary concludes the bank meets a variety of factors that suggest it is involved in money laundering. Once a bank is so designated, U.S. financial institutions must take certain measures against the designated bank in order to disrupt potential money laundering activity. The Treasury Finding against LCB outlined the key components of an international money laundering network run through LCB, discussed below, including the roles of various international drug traffickers and Hezbollah operatives, including Defendants. It also, among other things, directed U.S. banks to sever their correspondent banking relationships with LCB.

71.     Abou Jaoude and Hamdoun are directly named as key players in the money laundering network run through LCB. The Treasury Finding states that "the [United States Government] has information indicating that a minority owner of the bank, who concurrently serves as General Manager [Abou Jaoude], his deputy [Hamdoun], and the managers of key branches are in frequent—in some cases even daily—communication with the various members of the . . . drug trafficking and money laundering network, and they personally process transactions on the network's behalf."

72.     In December 2011, the United States Attorney for the Southern District of New York filed a civil forfeiture complaint, which it amended on October 26, 2012 ("Civil Forfeiture Complaint") against LCB and various other defendants. The Civil Forfeiture Complaint outlined in much greater detail the money laundering scheme initially described in the Treasury Finding. *See* Exhibit B. In addition to the U.S. Department of the Treasury Finding and the U.S. Attorney for the Southern District of New York's Civil Forfeiture Complaint, the Office of the U.S. Attorney for the Eastern District of Virginia also investigated the international drug trafficking network and LCB's role in the scheme that laundered the illicit proceeds of that network. After the Treasury Department's Notice of Finding against LCB, the U.S. Attorney for the Eastern District of Virginia obtained a criminal indictment ("Criminal Indictment") of Defendant Joumaa in late 2011. *See* Exhibit C.

73.     As a result of the U.S. Government's investigations into LCB, Abu Nahl and the other members of the Nest Group finally came to realize why Abou Jaoude and Hamdoun had frustrated their attempts to increase transparency and strengthen internal controls at the Bank: Abou Jaoude, Hamdoun and Safa were surreptitiously using the Bank to line their own pockets and to further the international narcoterrorism operation described below.

### i.  International Drug Trafficking

74.     Defendant Joumaa, sometimes identified by his alias "Junior," is a dual Lebanese and Colombian citizen. According to the Criminal Indictment in the Eastern District of Virginia, Joumaa led a drug trafficking network that spanned from South America to Africa and stretched up into both the United States and Europe. Operations in Lebanon, West Africa, Panama, and Colombia formed the backbone of Joumaa's trafficking network.

75.     According to the Criminal Indictment, Joumaa and his organization played a dual role in the drug trafficking operation. First, Joumaa coordinated the shipment of narcotics,

tens of thousands of kilograms of cocaine, from Colombia through Central America and Mexico, to the United States. Second, he helped coordinate beginning around 1997 through at least 2010 the laundering of hundreds of millions of dollars in proceeds from drug sales in the United States, Europe (predominantly Spain), Mexico, and Central America. Joumaa reportedly charged a fee of between 8 and 14 percent for laundering the proceeds of international drug sales.

76.     Defendant Salhab ran an international network of money couriers centered in West Africa, as described in both the Treasury Department Finding and the Civil Forfeiture Complaint. According to those documents, Salhab's couriers transport currency in bulk through West Africa to Lebanon, as well as into the United States, and that the money transported by Salhab's couriers included the proceeds of illegal drug sales in Europe, particularly Spain, destined for laundering by Joumaa's organization.

77.     Hezbollah was formed in Lebanon in around 1982. It has been designated as a terrorist organization under the U.S. Terrorism Sanctions Regulations, 60 Fed. Reg. 5079 (Jan. 23, 1997), the Foreign Terrorist Organizations Sanctions Regulations, 62 Fed. Reg. 52,650 (Oct. 8, 1997), the Global Terrorism Sanctions Regulations, 67 Fed. Reg. 12,633 (Mar. 19, 2002), and the Iran and Syria Nonproliferation Act, 72 Fed. Reg. 20,158 (Apr. 23, 2007).

78.     Hezbollah derived substantial financial support from Joumaa's drug trafficking operation and from Salhab's money laundering network. For example, according to the Civil Forfeiture Complaint, (1) Joumaa used Hezbollah couriers to transport currency in bulk and (2) Salhab routinely paid Hezbollah a fee to provide security for currency transport operations, particularly when the currency was transported through the Beirut International Airport.

79.     Around the mid-2000s, much of Joumaa's drug trafficking operation and Salhab's money courier network in Africa was centered in Benin, Togo, and the Democratic

Republic of the Congo. Upon information and belief, Joumaa and Salhab were interested in expanding their operations into Northern Africa because of its proximity to Europe and especially Spain, where many of the proceeds of illegal narcotics sales were generated. Algeria was a prime candidate into which Joumaa and Salhab wished to expand their narcoterrorism network.

### ii. Defendants' Money Laundering Scheme

80.  When Abu Nahl was initially negotiating with Abou Jaoude to acquire a stake in LCB, it did not know he had an ulterior motive for wanting the deals to advance: Abou Jaoude and Hamdoun wanted control of TBA to further the money laundering scheme. As discussed *supra*, Abou Jaoude and Hamdoun had established secretive banking operations in Gambia and Congo which, upon information and belief, they used to advance their money laundering scheme. Adding operations in Algeria would further benefit the scheme.

81.  The port in Algiers, where TBA is headquartered, is one of the busiest in Algeria, with heavy cargo and tanker traffic to and from Europe and elsewhere, and frequent passenger ferry service to and from France and Spain. A majority of the proceeds Joumaa's organization received from drug sales in Europe was generated in Spain, making Algeria a convenient access point for receiving and laundering those illicit proceeds.

82.  Additionally, and unbeknownst to Abu Nahl and the Nest Group when they were negotiating the LCB deal in 2005 and 2006, Abou Jaoude and Hamdoun planned to use the banks to siphon off money for their personal use. With at least $15 million in private debt with multiple banks in Lebanon and elsewhere, Abou Jaoude had a pressing need to increase his own access to capital to satisfy his debts. By organizing the money laundering scheme, Abou Jaoude hoped to increase the amount of capital flowing through banks under his control, making it easier to siphon off funds for personal use without detection.

83.     Abou Jaoude and Hamdoun actively concealed the scheme to use the banks to facilitate an international money laundering operation for the benefit of themselves and Hezbollah at (and after) the time that he induced Abu Nahl and the Nest Group to invest in LCB.

84.     The plan hatched by Abou Jaoude and Hamdoun was simple: using their control over the banks, they would establish systems to allow money to be laundered efficiently and without detection. Once those systems were in place, Joumaa would begin laundering drug proceeds from Europe and Africa and, as detailed in the Criminal Indictment, would take a percentage fee for laundering the money. Salhab's operation, as described in the Civil Forfeiture Complaint, would provide transportation services for the goods and money involved in the scheme. Abou Jaoude, Hamdoun, and Safa would profit from the increased flow of money through the banks which would, among other things, enable them to siphon off more money for their own personal use.

85.     On November 30, 2006, Joumaa opened a bank account at LCB to commence the money laundering operations.

86.     As part of the money laundering scheme, Abou Jaoude, Hamdoun, and Safa used LCB to wire substantial amounts of U.S. currency to used car buyers throughout the United States. These wire transfers passed through correspondent banks in New York. According to the Civil Forfeiture Complaint, Joumaa and the individuals and entities associated with his organization originated approximately $62 million in wire transfers through LCB between 2006 and 2011. Ayash and the individuals and entities associated with his organization originated at least $32 million in wire transfers through LCB between 2006 and 2011. Salhab and the individuals and entities associated with his organization originated, according to the Civil Forfeiture Complaint, at least $7.5 million in wire transfers through LCB between 2006 and 2011.

87.     As described in greater detail in the Civil Forfeiture Complaint, the wire transfers typically were for tens of thousands of dollars each, with some U.S. car buyers receiving a handful of wire transfers between 2007 and 2011, and others receiving hundreds of transfers. For example, during that time period, MGM Global Trading, LLC in South Windsor, Connecticut received 353 wire transfers totaling almost $33.5 million and World Auto Sales, LLC in Birmingham, Alabama received 490 wire transfers totaling over $24 million. Together, between 2007 and 2011, 30 used car purchasers in Alabama, Connecticut, Florida, Georgia, Maryland, Massachusetts, Michigan, New Jersey, North Carolina, Ohio, Oklahoma, and Tennessee received over 3,500 wire transfers totaling nearly $250 million.

88.     Among the used car purchasers that received wire transfers was United Auto Enterprize, Inc., which, according to corporate records maintained by the Michigan Department of Licensing and Regulatory Affairs was registered on March 21, 2007 by Rola Salhab. Upon information and belief, Rola Salhab is related to Defendant Salhab. United Auto Enterprize's registered address in Redford, Michigan is the same as Cybamar Swiss's registered address.

89.     On February 2, 2007, Fadi Salhab, who is a member of Defendant Salhab's family, registered Cybamar Swiss Gmbh, LLC with the Michigan Department of Licensing and Regulatory Affairs. On January 28, 2008, another member of the Salhab family, Dina Salhab, registered another affiliated company, Cybamar USA, LLC, with the Michigan Department of Licensing and Regulatory Affairs. Cybamar Swiss and Cybamar USA share the same registered address in Redford, Michigan.

90.     According to the Treasury Finding and the Civil Forfeiture Complaint, the car buyers in the United States would use the money wired through LCB and correspondent banks

in New York to purchase used cars. These used cars were then shipped to various ports in West

Africa, including in Benin and Togo. Cybamar Swiss, a shipping company, was frequently used to

transport the cars to West Africa.

91.     According to the Treasury Finding and Civil Forfeiture Complaint, after the

cars arrived in West Africa, Joumaa and Salhab's networks purchased them using, at least in part,

bulk currency generated from narcotics sales in Europe (primarily Spain) and Africa. For example,

as detailed in the Civil Forfeiture Complaint, Salhab owned and controlled STE Nomeco SARL,

which owned and operated used car lots in Benin. The used cars shipped from the United States

were purchased in these and other used car lots using proceeds from Joumaa's international drug

trafficking ring.

92.     Once the cars were sold, according to the Civil Forfeiture Complaint,

Salhab's money courier network transported the currency overland or by air from West Africa to

Lebanon. When the currency arrived in Lebanon, it was deposited either in LCB accounts, or with

the Hassan Ayash Exchange or the Ellissa Exchange.

93.     LCB maintained substantial banking relationships with both the Hassan

Ayash Exchange and the Ellissa Exchange. LCB maintained these and other relationships at the

direction of Abou Jaoude and Hamdoun and in spite of mounting evidence of the Ayash and

Ellissa Exchanges' involvement in narcoterrorism and money laundering. Indeed, given concerns

about potential money laundering activity, at least one other Lebanese bank had refused to

continue doing business with the Ellissa Exchange.

94.     According to the Civil Forfeiture Complaint, an internal LCB customer due

diligence report found that the Ellissa Exchange and its principals were involved in smuggling

bulk currency out of Africa, including through flights from Ghana to Beirut. The report also noted

that the Bank had limited and incomplete "Know Your Customer" files for the Ellissa Exchange. In particular, the due diligence report highlighted large cash deposits into LCB accounts held by the Ellissa Exchange principals, transactions inconsistent with the nature and purpose of those accounts, and the Ellissa Exchange's failure to provide information about the nature and purpose of the suspicious transactions. Upon information and belief, Abou Jaoude, Hamdoun, and Safa concealed the due diligence report and directed other Bank employees to ignore substantial violations of LCB's anti-money laundering and compliance policies.

95.     LCB policy required disclosure of the source of funds of any cash deposit greater than $10,000. For each such cash deposit, this information was supposed to be recorded on a Cash Transaction Slip ("CTS"). LCB was then supposed to file each CTS with the Central Bank of Lebanon.

96.     As detailed in the Civil Forfeiture Complaint, Safa granted exceptions to certain LCB clients to allow them to deposit more than $10,000 in cash without filing a CTS. Many of the clients Safa exempted from the CTS policy had ties to Hezbollah and had been named as money launderers and terrorists by the United States government. As detailed in the Civil Forfeiture Complaint:

a.     Safa exempted the Yousser Company, an LCB client, from the CTS policy, allowing it to deposit up to $50,000 per week in cash at LCB's Nabatieh branch and up to $60,000 per day in cash at LCB's Airport Road branch without disclosing the source of the funds. In 2006, the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") named the Yousser Company a Specially Designated Global Terrorist organization. OFAC is empowered under various Executive Orders to name individuals and organizations as Specially Designated Global Terrorists if it finds they have or are likely to commit terrorist acts, or they provide support

or associate with terrorists or terrorist organizations. Various U.S. sanctions apply to individuals and organizations that OFAC names Specially Designated Global Terrorists.

        b.      Safa also exempted the Farah Company for Tourism, a subsidiary of the Yousser Company, from the CTS policy. The Farah Company for Tourism was allowed to deposit around $33,000 per week at the Nabatieh branch without disclosing the source of the funds.

        c.      Safa exempted two of the owners of the Yousser Company, Hussein Ali Mohamed Chami (sometimes called Husayn al-Shami) and Wahid Mahmoud Sbeity, from the CTS policy. Al-Shami and Sbeity were allowed to deposit up to $30,000 per week in cash at the Nabatieh branch without disclosing the source of the funds. Al-Shami and two other Yousser Company directors were also allowed to deposit a total of $332,000 per day in cash at the Airport Road Branch without disclosing the source of the funds. OFAC has named Al-Shami a Specially Designated Global Terrorist.

        97.      Taken together, Safa, at the direction of Abou Jaoude and Hamdoun, permitted government-identified terrorists and terrorist organizations to deposit at least $200 million in cash per year without disclosing the source of the funds. The money laundering operation, largely run through Joumaa and Salhab's organizations, used these exceptions to funnel the proceeds of illegal narcotics sales and other illicit operations into the legitimate banking sector.

        98.      Abou Jaoude and Hamdoun used LCB operations in West Africa, including Prime Bank Gambia, to help facilitate their money laundering scheme. As described in ¶ 64, *supra*, they intentionally kept LCB operations in the region shrouded in secrecy to hide their illicit activities. They also intentionally did not implement proper compliance and control measures in LCB West African operations in order to conceal their money laundering scheme.

99.     Upon information and belief, Abou Jaoude and Hamdoun benefitted financially as a result of their participation in the money laundering scheme.

**F.**     **The Central Bank of Lebanon's Complicity in the Money Laundering Scheme**

100.     The Lebanese banking sector is one of the most financially active in the Middle East, and also one of the least transparent. Lebanon has a strict Bank Secrecy Act that allows account holders to conduct their affairs with essentially no scrutiny. In the Bureau of International Narcotics and Law Enforcement Affairs' 2014 International Narcotics Control Strategy Report, the U.S. Department of State stated that "Lebanon faces significant money laundering and terrorism financing challenges," particularly given the "substantial influx of remittances from expatriate[s]" into the country and the involvement of many Lebanese abroad in "underground finance and trade-based money laundering (TBML) activities," like the used car scheme operated through LCB.

101.     Other countries in the Middle East and North Africa region have raised similar concerns about money laundering and terrorism financing in Lebanon. A 2009 report by the Middle East and North Africa Financial Action Task Force ("MENAFATF"), a voluntary organization of nation states in the region, said Lebanon had a "special susceptibility" to money laundering and terrorism financing and had failed to issue "all legal instruments needed to comply with the main requirements stated in the 40 Recommendations and 9 Special Recommendations [from the Financial Action Task Force] for [Anti-Money Laundering and Combating Financing of Terrorism]."

102.     In particular, the MENAFATF report noted that Lebanon did not require financial institutions "to report any transaction suspected to be related to terrorism financing crimes," nor were such institutions required to report "suspicious transactions attempts." The

report concluded that "from the practical aspect, the competency and efficiency of [financial institutions] in reporting is not up to the level required or appropriate, in light of the numerous reporting cases by banks, and its low number or even absence on part of the remaining institutions."

103. Ultimately, the MENAFATF report rated Lebanon on its compliance with 49 international recommendations to combat money laundering and terrorism financing. In the report, Lebanon's regional neighbors found the country only partially compliant or not at all compliant with 26 of the 49 recommendations.

104. The Governor of the Central Bank of Lebanon exerts substantial personal control over the banking sector in the country. For example, the Central Bank lifts the Bank Secrecy Act to allow prosecutors to investigate allegations of wrongdoing only at his direction. Hamdoun has claimed to have a close personal relationship with the Governor.

105. Over the years, Abu Nahl and the Nest Group repeatedly attempted to raise the lack of internal controls at LCB with the Central Bank of Lebanon. For example, in a letter dated February 7, 2011 to the Banking Control Commission of Lebanon, which is administered by the Central Bank, Abu Nahl reiterated Nest's concerns about "the non-compliance of the Executive Management of [LCB] with the applicable laws, regulations and circulars . . . ." In particular, Abu Nahl highlighted concerns about how the Bank management was preparing financial statements, LCB's external investments, and Tabadul.

106. Despite Nest's repeated efforts, the Central Bank of Lebanon turned a blind eye to the compliance problems at LCB. Upon information and belief, the Central Bank of Lebanon was aware that LCB was being used by Abou Jaoude and Hamdoun to launder funds

derived from narcoterror operations, but took no action in part because of the Governor's

relationship with Hamdoun.

107.    The finding by the U.S. government that LCB was engaged in substantial

money laundering activity, however, finally forced the Central Bank of Lebanon to act. In an effort

to to shield the broader Lebanese banking sector from further scrutiny by U.S. authorities, the

Central Bank of Lebanon pressured LCB into a rapid liquidation and a sale of substantially all

assets and liabilities to another Lebanese bank.  As a result, the LCB issue was swept under the

rug.  According to a New York Times report in the aftermath of LCB's collapse, the Central Bank

of Lebanon official responsible for overseeing the liquidation process has ties to Hezbollah.

108.    Although the Central Bank of Lebanon forced LCB out of business, it has

continued to turn a blind eye to the broader issues of money laundering and terrorist financing that

are pervasive in the Lebanese banking sector. Tellingly, the Central Bank of Lebanon has failed to

hold accountable even the very LCB managers whom the U.S. Treasury Finding stated were

complicit in the money laundering operation run through LCB.

109.     No apparent effort has been made by the Central Bank of Lebanon to

pursue the  serious issues raised in the US government's filings or to address any of the failings in

bank supervision that they imply.

110.    The Central Bank of Lebanon has the ability to veto the appointment of

Abou Jaoude and Hamdoun as liquidators to oversee the dissolution of the Bank, but failed to do

so, effectively accepting their appointment. Serving as liquidators put Abou Jaoude and Hamdoun

in a position to further cover up their illicit activity and to maximize their own personal gains.

111.    As referenced above, in or around 2010, Defendant Safa assumed a position in the Central Bank of Lebanon. Despite the public disclosure of Safa's role in the money laundering scheme, he continues to serve as a Member of the Banking Control Commission.

112.    Upon information and belief, as also referenced above, Abou Jaoude and Hamdoun, with the approval of the Central Bank of Lebanon, are preparing to open a new bank in Lebanon.

### G.    Aftermath of LCB Money Laundering Scandal

113.    On June 25, 2013, Abou Jaoude and Hamdoun, acting as trustees responsible for LCB's liquidation, settled the civil forfeiture suit with the Office of the U.S. Attorney for the Southern District of New York. In order to quickly cast the spotlight off their own illicit conduct, Abou Jaoude and Hamdoun forfeited $102 million of LCB's money to settle the U.S. government action.

114.    The disclosure of the money laundering scheme in February 2011 came as a shock to Abu Nahl and the Nest Group. While their concerns with the lack of internal controls at LCB and with Abou Jaoude and Hamdoun's stonewalling had grown over time, it was not until the filing of the Civil Forfeiture Complaint that they began to realize the full extent of Abou Jaoude and Hamdoun's wrongdoing. For instance, they finally realized that Abou Jaoude and Hamdoun were actively frustrating their efforts to understand and improve LCB's operations because it posed a direct threat to their money laundering scheme and, as part and parcel of that scheme, their efforts to siphon off money from the Bank into their own personal slush fund.

115.    Despite the Nest Group's lack of knowledge of or participation in the money laundering activities at LCB, and their repeated attempts to impose and improve money laundering controls following their minority investment in LCB, the U.S. government has denied

entry visas to Abu Nahl, his family members and a number of employees of Nest Investments or other Nest Group companies. The U.S. government did so because of the Nest Group's investment in, and affiliation with, LCB.

## DERIVATIVE STANDING

116.    Plaintiffs bring this action derivatively in the right and for the benefit of LCB to redress injuries suffered by LCB as a direct result of the breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Defendants. LCB is named as a nominal defendant solely in a derivative capacity.

117.    Plaintiffs will adequately and fairly represent the interests of LCB and its shareholders in enforcing and prosecuting its rights.

118.    Plaintiffs were owners of LCB shares at all times relevant to the Defendants' wrongful course of conduct in respect of derivative actions alleged herein. Plaintiffs maintain an interest in LCB through their status as beneficiaries of the corporation in liquidation.

119.    At the time that this action was commenced, LCB was in liquidation. Abou Jaoude and Hamdoun were serving as the sole Trustees of LCB in liquidation.

120.    As a result of the facts set forth herein, Plaintiffs did not make a demand upon the Bank or its Trustees to institute this action against the Defendants. Such a demand would have been a futile and useless act because the Trustees are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

Case 1:20-mc-00046-ABJ Document 1-21 Filed 06/16/21 Page 38 of 49
Case 1:15-cv-09755-LGS Document 121 Filed 12/14/18 Page 38 of 49

## FIRST CAUSE OF ACTION (DERIVATIVE)
### RICO
### (Violation of 18 U.S.C. § 1962(c))
### (Association-in-Fact Enterprise)
### (By Plaintiff LCB Against All Defendants)

121.    Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

122.    Defendants violated 18 U.S.C. § 1962(c) by the acts described above, and as further described below.

123.    At all times relevant herein, Plaintiff LCB was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

124.    At all times relevant herein, each of the Defendants was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

125.    At all times relevant herein, the Defendants and their co-conspirators formed, operated, conducted and participated, directly or indirectly, in the conduct of the enterprise's affairs in violation of 18 U.S.C. § 1962(c).

126.    Beginning in or around 2005, Defendants and others formed an association-in-fact enterprise (the "Money Laundering Enterprise") within the meaning of 18 U.S.C. § 1961(4) for the purpose of carrying out the money laundering scheme described herein. The "Money Laundering Enterprise" is comprised of persons, both inside and outside of the United States, who have worked to facilitate the laundering of illegally obtained funds through the United States and elsewhere in order to conceal the profits obtained by Defendants and other members of the Money Laundering Enterprise, including proceeds from the trafficking of narcotics.

127.    The Money Laundering Enterprise is an "enterprise" within the meaning of 18 U.S.C. § 1961(4). It has functioned as a continuing unit with an ascertainable existence separate and distinct from the pattern or racketeering activity described herein. It has engaged in activities which substantially affected foreign and interstate commerce.

128.    As described in paragraphs 70 through 99 above, each Defendant has participated in the operation and/or management of the Money Laundering Enterprise.

129.    Defendants have conducted the affairs of LCB and the Money Laundering Enterprises through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), in violation of 18 U.S.C. § 1962(c). As further detailed below, each Defendant engaged in at least two acts of racketeering activity in furtherance of the Money Laundering Enterprise.

130.    Specifically, at all times relevant herein, Defendants and other co-conspirators have, as part of the Money Laundering Enterprise, conducted and/or participated in a pattern of racketeering activity, including money laundering and wire fraud that took place in New York and elsewhere in the United States and abroad, in violation of 18 U.S.C. § 1962(c) and (d). Each Defendant subscribed to and endorsed the unlawful purposes of the Money Laundering Enterprise, and either participated in, facilitated and/or aided and abetted at least two of the predicate acts that were sufficiently related and had sufficient continuity to form a pattern of racketeering activity.

131.    Defendants' pattern of racketeering activity included the unlawful actions and activities of Defendants and others, including but not limited to money wire transfers constituting wire fraud in violation of 18 U.S.C. § 1343 and money laundering activities in violation of 18 U.S.C. § 1956.

132.     As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(c), LCB has been injured in its business and property within the meaning of the civil RICO statute by, among other things, (a) the illegal siphoning away of Bank assets by Defendants Abou Jaoude and Hamdoun, which was intended both to enrich the Defendants and to protect their assets if and when the money laundering scheme was uncovered, (b) the civil forfeiture payment made to the U.S. Government, (c) the loss of business resulting from LCB's inability to conduct business with correspondent banks located in the United States, and (d) the cessation of LCB's independent banking operations and its forced sale of substantially all of the Bank's assets and liabilities.

133.     As a result of their misconduct, the Defendants and other co-conspirators are liable to Plaintiff LCB for its losses in an amount to be determined at trial.

134.     Pursuant to 18 U.S.C. § 1964(c), Plaintiff LCB is entitled to recover treble damages in addition to the costs and attorneys' fees from the Defendants.

PREDICATE ACT
WIRE FRAUD IN VIOLATION OF 18 U.S.C. § 1343

135.     As detailed above, Defendants knowingly and willfully devised the Money Laundering Enterprise to defraud by means of misrepresentations, knowing that they were false when made and intending that they be relied upon.  These misrepresentations were reasonably relied upon.

136.     As detailed below, Defendants regularly used wire communications in furtherance of their fraudulent money laundering scheme.  This use was reasonably foreseeable.

137.     Between January 1, 2007 and early 2011, defendants Abou Jaoude, Hamdoun, and Safa caused LCB to originate 54 wire transfers, transmitted in interstate and foreign commerce, to A & J Auto Sales Inc. for $4,495,293, on behalf of Hassan Ayash Exchange.

138. Between January 1, 2007 and early 2011, defendants Abou Jaoude, Hamdoun, and Safa caused LCB to originate two wire transfers, transmitted in interstate and foreign commerce, to Auto Rama Inc. for $142,828 on behalf of the Ellissa Exchange.

139. Between January 1, 2007 and early 2011, defendants Abou Jaoude, Hamdoun, and Safa caused LCB to originate 14 wire transfers, transmitted in interstate and foreign commerce, to Edya Export Import Inc. for $1,145,540 on behalf of the Hassan Ayash Exchange.

140. Between January 1, 2007 and early 2011, defendants Abou Jaoude, Hamdoun, and Safa caused LCB to originate 17 wire transfers, transmitted in interstate and foreign commerce, to Edya Export Import Inc. for $1,679,051 on behalf of Oussama Salhab.

141. Between January 1, 2007 and early 2011, defendants Abou Jaoude, Hamdoun, and Safa caused LCB to originate 17 wire transfers, transmitted in interstate and foreign commerce, to Global Auto LLC for $1,234,008, on behalf of the Hassan Ayash Exchange.

142. Between January 1, 2007 and early 2011, defendants Abou Jaoude, Hamdoun, and Safa caused LCB to originate 36 wire transfers, transmitted in interstate and foreign commerce, to Global Shipping Services for $4,315,811, on behalf of the Hassan Ayash Exchange.

143. Between January 1, 2007 and early 2011, defendants Abou Jaoude, Hamdoun, and Safa caused LCB to originate 51 wire transfers, transmitted in interstate and foreign commerce, to MGM Global Trading LLC for $5,826,171 on behalf of the Hassan Ayash Exchange.

144. Between January 1, 2007 and early 2011, defendants Abou Jaoude, Hamdoun, and Safa caused LCB to originate 48 wire transfers, transmitted in interstate and foreign commerce, to Poliproject Inc. for $8,931,410, on behalf of the Hassan Ayash Exchange.

145.     Between January 1, 2007 and early 2011, defendants Abou Jaoude, Hamdoun, and Safa caused LCB to originate 24 wire transfers, transmitted in interstate and foreign commerce, to Safari Enterprises LLC for $1,279,431, on behalf of the Hassan Ayash Exchange.

146.     Between January 1, 2007 and early 2011, defendants Abou Jaoude, Hamdoun, and Safa caused LCB to originate 17 wire transfers, transmitted in interstate and foreign commerce, to United Auto Enterprize Inc. for $1,518,022 on behalf of Oussama Salhab.

147.     The foregoing acts of racketeering constituted a pattern of racketeering activity within the meaning of that term under 18 U.S.C. § 1961(5).

PREDICATE ACT
MONEY LAUNDERING IN VIOLATION OF 18 U.S.C. § 1956

148.     Defendants knowingly engaged in the laundering of monetary instruments in violation of 18 U.S.C. § 1956.

149.     Defendants knew that the proceeds of the Money Laundering Enterprise represented the proceeds of unlawful activity.

150.     Specifically, Defendants knew that the proceeds of the Money Laundering Enterprise were derived from the sale of cocaine, largely sourced from Venezuela and Colombia, that had been transported to Benin, Sierra Leone, Togo, and other West African nations, amounting to as much as $200 million per month.

151.     Defendants transmitted or transferred funds to a place in the United States from or through a place outside the United States. Specifically, defendants Abou Jaoude, Hamdoun, and Safa caused LCB to wire $229,872,953 to its correspondent bank accounts in the Southern District of New York. (LCB maintained correspondent banking relationships with the Bank of New York Mellon, Standard Chartered Bank, Wells Fargo Bank, JPMorgan Chase Bank,

- 42 -

and Mashreq Bank in New York.) A portion of these funds was subsequently disbursed to U.S. car dealers to purchase vehicles.

152.    Defendants transmitted or transferred funds from a place in the United States to or through a place outside the United States. Specifically, defendants Abou Jaoude, Hamdoun, and Safa caused LCB's U.S. correspondent accounts to pay Asian suppliers of consumer goods. Defendants then laundered the proceeds from reselling those goods in Latin America.

153.    Defendants intended to promote the carrying on of the Money Laundering Enterprise's unlawful activity.

154.    Defendants knew that the wire transfers were designed to conceal or disguise the nature, location, source, ownership, and/or control of the proceeds. Specifically, Defendants knew that funds were transmitted to LCB's U.S. correspondent accounts to purchase vehicles in the United States that were shipped to West Africa and sold for cash that was repatriated to Lebanon.

**SECOND CAUSE OF ACTION (DERIVATIVE)**
**RICO**
**(Violation of 18 U.S.C. § 1962(d)—Conspiracy to Violate § 1962(c))**
**(Association-in-Fact Enterprise)**
**(By Plaintiff LCB Against All Defendants)**

155.    Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

156.    Each defendant knowingly and unlawfully agreed to participate in the conduct of the Money Laundering Enterprise with the knowledge and intent that other members of the conspiracy would commit at least two predicate acts. Each defendant intended to further, and

did further, the money laundering scheme that was the objective of the Money Laundering Enterprise.

157.     Defendants violated 18 U.S.C. § 1962(d) by the acts described above.

## THIRD CAUSE OF ACTION (DIRECT)
### Fraud in the Inducement
**(By Plaintiffs Abu Nahl & Nest Investments Holding Lebanon SAL Against Defendants Abou Jaoude & Hamdoun)**

158.     Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

159.     Plaintiffs entered into an agreement to invest in LCB.

160.     Plaintiffs' willingness to assent to the terms of the agreement, and the agreement itself, was caused by the material fraudulent misrepresentations of Defendants Abou Jaoude and Hamdoun and their agents.

161.     Defendants Abou Jaoude and Hamdoun fraudulently misrepresented LCB's history of compliance with anti-money laundering and international banking laws and best practices to Plaintiffs.

162.     Defendants Abou Jaoude and Hamdoun fraudulently misrepresented their intentions to cause LCB to remain in compliance with anti-money laundering and international banking laws and best practices to Plaintiffs.

163.     Defendants Abou Jaoude and Hamdoun fraudulently misrepresented the legitimacy of LCB's business operations to Plaintiffs.

164.     Defendants Abou Jaoude and Hamdoun fraudulently misrepresented the reason they sought Plaintiffs' investment in LCB.

165.     Each of the representations described in paragraphs 160 through 163 was material to Plaintiffs' decision to invest in LCB. Plaintiffs, believing them to be true, reasonably relied on each of these representations.

166.     These representations were false. Defendants knew these representations to be false, and Defendants intended that Plaintiffs rely on these representations to induce Plaintiffs to enter into the agreement.

167.     Plaintiffs have been damaged by Defendants actions.

168.     Defendants' conduct was malicious, fraudulent, oppressive and/or recklessly committed, with wanton disregard of Plaintiffs' rights.

### FOURTH CAUSE OF ACTION (DERIVATIVE)
**Breach of Fiduciary Duty**
**(By Plaintiff LCB Against Defendants Abou Jaoude & Hamdoun)**

169.     Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

170.     Defendants Abou Jaoude and Hamdoun, as officers and/or directors of LCB, owed fiduciary duties to LCB and were required to use their ability to control and manage LCB in a fair, just, and equitable manner. They were required to use their positions to ensure the Bank complied with applicable laws and contractual obligations, to refrain from abusing their positions of control, and not to favor their own interests at the expense of LCB. They violated their fiduciary duties to LCB, including without limitation their duties of care, good faith, honesty, and loyalty.

171.     The wrongful conduct particularized herein was not due to an honest error in judgment, but rather to Defendants' gross mismanagement, bad faith, reckless and/or willful

disregard of the rights and interests of LCB and its shareholders, and for acting without the
reasonable and ordinary care which they owed to LCB.

172.     As a result of the foregoing, Defendants have breached fiduciary duties
owed to LCB.

173.     LCB has been harmed as a result of Defendants' breaches.

### FIFTH CAUSE OF ACTION (DERIVATIVE)
**Abuse of Control**
**(By Plaintiff LCB Against Defendants Abou Jaoude & Hamdoun)**

174.     Plaintiff incorporates by reference the allegations set forth above as though
fully restated herein.

175.     Defendants Abou Jaoude and Hamdoun, by virtue of their positions and
financial holdings in LCB, exercised control over LCB and its operations, and owed duties as
controlling persons to LCB not to use their positions of control for their own personal interests and
contrary to the interest of LCB.

176.     Defendants' conduct amounts to an abuse of their control of LCB, in
violation of their obligations to LCB.

177.     LCB was harmed as a result of Defendants' conduct.

### SIXTH CAUSE OF ACTION (DERIVATIVE)
**Corporate Waste**
**(By Plaintiff LCB Against Defendants Abou Jaoude & Hamdoun)**

178.     Plaintiff incorporates by reference the allegations set forth above as though
fully restated herein.

179.     As alleged in detail, Defendants had a fiduciary duty to exercise good faith
and diligence in the administration of the affairs of LCB and in the use and preservation of its
property and assets, and had the highest obligation of fair dealings.

- 46 -

180.    Defendants wasted LCB's corporate assets by diverting corporate assets for improper purposes, instead of using those assets for their intended purpose.

181.    LCB was harmed as a result of Defendants' conduct.

## SEVENTH CAUSE OF ACTION (DERIVATIVE)
### Unjust Enrichment
### (By Plaintiff LCB Against Defendants Abou Jaoude & Hamdoun)

182.    Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

183.    Defendants derived compensation, fees, and other benefits from LCB and were otherwise unjustly enriched during the time in which the wrongful practices occurred, to the detriment of LCB. Defendants profited by engaging in the wrongful conduct set forth herein.

184.    Defendants also wrongfully converted funds belonging to LCB.

185.    Defendants' enrichment is directly and causally related to the detriment of LCB.

186.    These benefits were accepted by Defendants under such circumstances that it would be inequitable for it to be retained without payment. As alleged above, Defendants breached their fiduciary duties to and/or abused their positions of control within LCB and therefore Defendants are not justified in retaining the benefits conferred upon them.

*This space intentionally left blank.*

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court award a judgment on all claims and award it such damages and compensation, including punitive damages, interest, attorneys' fees, costs and such other relief as this Court may deem just.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated:   December 14, 2015

COVINGTON & BURLING LLP


By:    /s/ Anthony Herman

Anthony Herman
Christian J. Pistilli
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001
Tel: (202) 662-6000
Email: aherman@cov.com
           cpistilli@cov.com

*Attorneys for Plaintiffs*

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I, Ghazi Abu Nahl, declare under penalty of perjury under the laws of the United States of America that the factual averments set forth in the foregoing Verified Complaint are true and correct, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true and correct.

Subscribed to by the Plaintiff on this _13 day of November, 2015.

_____
Ghazi Abu Nahl

- 1 -